IN RE COMPLAINT AGAINST WILLIAM D. STALEY, JUDGE OF THE SEPARATE JUVENILE COURT OF SARPY COUNTY, NEBRASKA. STATE OF NEBRASKA EX REL. COMMISSION ON JUDICIAL QUALIFICATIONS, RELATOR, V. WILLIAM D. STALEY, RESPONDENT.

486 N.W.2d 886

Filed July 31, 1992.   No. JQ-89-004.

Patrick T. O'Brien, of Bauer, Galter, O'Brien & Allan, for relator.

E. Dean Hascall for respondent.

BOSLAUGH, WHITE, CAPORALE, SHANAHAN, GRANT, and FAHRNBRUCH, JJ.

PER CURIAM.

This is an original proceeding in this court upon a complaint filed by the Nebraska Commission on Judicial Qualifications charging, in five counts, misconduct by the respondent, William D. Staley, a judge of the separate juvenile court of Sarpy County. The original complaint was filed on December 26, 1989. An amended complaint was filed by the commission on August 20, 1990.

Pursuant to Neb. Const. art. V, § 30, and Neb. Rev. Stat. § 24-721 (Reissue 1989), this court appointed the Honorable Lyle Winkle as special master to conduct hearings concerning the allegations. These hearings commenced on September 17, 1990, and were completed on September 20, 1990.

The master found that the charges contained in counts 1, 2, 3, and 4 were supported by clear and convincing evidence and that the respondent's conduct violated Neb. Rev. Stat. § 24-722(1), (2), and (6) (Reissue 1989) and Canon 3A(3) and (4) of the Code of Judicial Conduct. The commission adopted the master's findings with respect to counts 2 and 3, but dismissed counts 1 and 4. Neither the master nor the commission found sufficient evidence to support the charges contained in count 5.

The commission recommended the following disciplinary action against the respondent:

A. That Judge William D. Staley be given a public reprimand because of the violations set out above.

B. That Judge William D. Staley be directed to abide by the rules and court decisions requiring the making and preserving of a verbatim transcript of all court proceedings in connection with juvenile matters, except in such cases in which all parties agree to waive a record, and the judge concurs in such waiver, and Judge Staley shall, however, cause a record to be made of such waiver by means of either a verbatim record or a written waiver signed by the waiving party or his or her attorney; that Judge William D. Staley further be reminded of the requirement that except in special circumstances, all court proceedings shall be open to the public and that those proceedings which are for a good cause closed shall nevertheless be reported verbatim by the court reporter for preservation of the record.

C. That all costs and expenses of this proceeding, excluding the fees of the prosecuting attorney, Patrick T. O'Brien, for his legal services only, be taxed against William D. Staley.

On January 25, 1991, the respondent filed a "Petition/Brief" asking this court to modify or reject the commission's recommendations.

The statute, § 24-722, which the respondent is alleged to have violated provides in relevant part:

A Justice or Judge of the Supreme Court or judge of any court of this state may be reprimanded, disciplined, censured, suspended without pay for a definite period of time not to exceed six months, or removed from office for (1) willful misconduct in office, (2) willful disregard of or failure to perform his or her duties . . . or (6) conduct prejudicial to the administration of justice that brings the judicial office into disrepute . . . .

The relevant portion of Canon 3 of the Code of Judicial Conduct as adopted by this court is as follows:

## A. ADJUDICATIVE RESPONSIBILITIES.
. . . .

(3) A judge should be patient, dignified, and courteous to litigants, jurors, witnesses, lawyers, and others with whom he or she deals in an official capacity, and should require similar conduct of lawyers, and of his or her staff, court officials, and others subject to his or her direction and control.

(4) A judge should accord to every person who is legally interested in a proceeding, or a party's lawyer, full right to be heard according to law, and, except as authorized by law, neither initiate nor consider ex parte or other communications concerning a pending or impending proceeding. . . .

The commentary to Canon 3A(3) states: "The duty to hear all proceedings fairly and with patience is not inconsistent with the duty to dispose promptly of the business of the court. Courts can be efficient and business-like while being patient and deliberate."

The object of the Code of Judicial Conduct adopted by this court is to delineate what conduct should be avoided for its prejudicial potential. Therefore, a clear violation of the code constitutes, at a minimum, a violation of § 24-722(6). *In re Complaint Against Kelly*, 225 Neb. 583, 407 N.W.2d 182 (1987).

Since this court received no evidence in addition to that heard by the master, the matter is to be reviewed in this court de novo upon the record made before the master. *In re Complaint Against Kelly, supra.* This court must first determine, upon its own independent inquiry, whether the charges against the respondent are supported by clear and convincing evidence; next, we must determine which, if any, canons of the Code of Judicial Conduct and subsections of § 24-722 may have been violated; and finally, we must determine what discipline, if any, is appropriate under the circumstances. *In re Complaint Against Kelley, supra.*

## COUNT 1
Count 1 of the amended complaint alleged:

1. That said William Staley did on the 25th day of February 1988 conduct himself in a manner prejudicial to the administration of justice, that brought the judicial office into disrepute contrary to Neb. Rev. Stat. §24-722(6) (Reissue 1985) in that he did fail to be patient, dignified and courteous to the litigants, lawyers and others with whom he dealt in an official capacity in that he did in case number Docket 17 Page 254 state that he did not believe an in-court statement by a lawyer on the record, to wit, Lisa Swinton, Attorney for the Department of Social Services, and in case number Docket 20 Page 173 by in several instances berating the family of the subject juvenile, and in cases number Docket 18 Page 316 and Docket 19 Page 302, by making disparaging comments to the juvenile's mother in a manner that was neither patient, dignified or courteous, all in violation of Canon 3(A)(3) and (4) of the Code of Judicial Conduct.

With respect to the allegations involving Lisa Swinton, the record shows that on February 25, 1988, Swinton represented the Nebraska Department of Social Services (DSS) at a hearing before the respondent in a case involving the placement of a juvenile at the Lincoln Regional Center. Previously the juvenile had been placed at the Youth Development Center at Geneva, Nebraska, but when he was returned to Sarpy County pending placement in the Lincoln Regional Center it was determined that an interim placement for the juvenile would be necessary until an opening became available at the Lincoln Regional Center. A conflict then arose regarding the juvenile's interim placement. DSS personnel contended, on the advice of a psychologist, that the youth should be placed in a locked, secure facility, but a probation officer sought placement for the juvenile in a less restrictive facility. Although the probation officer requested a hearing to resolve the dispute, the conflict was resolved prior to the hearing when space at the Lincoln Regional Center unexpectedly became immediately available for the youth.

Nevertheless, the respondent proceeded to conduct a hearing concerning the youth's placement. At this hearing the

respondent voiced general displeasure with DSS' placement of juveniles, and the hearing concluded with the following exchange:

THE COURT: . . . I have no doubt whatsoever in this case that the recommendation made by the Department of Social Services to place this young man in jail was based on the lack of alternatives and not because he needed to be incarcerated in the jail. And I will for one — I will not allow this court system to be utilized to — at the expense of kids and their families to compensate for the incompetence of the system that we need to — to be competent.

. . . And I think some things have to be changed in the Department of Social Services so we don't keep putting kids in places they don't belong just because we don't have any other choice.

. . . .

[DSS EMPLOYEE]: Your Honor, I was told myself by Dr. Riedler before Brian left there that . . . this child should not be on the street, he should not be home, he should not be in foster care, he needs to be in a locked facility.

THE COURT: Like St. Josephs [sic] Hospital. That's why he was in St. Josephs [sic] Hospital before he left for the Youth Development Center at Geneva. But talking about a locked facility at St. Josephs [sic] Hospital and isolation in the Sarpy County Jail are two severely different things.

And I will tell you up front I am not going to put kids in the youth center and I'm not going to put kids in jail just because the Department of Social Services wants to save a few bucks.

MS. SWINTON: Your Honor, this has never been a question of saving money. This situation —

THE COURT: You'll excuse me, Counselor, if I just don't believe you.

We are adjourned.

It is clear from the record that Swinton was not allowed to present and defend DSS' position with respect to the placement

of the youth in question. Of course, when space at the Lincoln Regional Center suddenly became available, the placement issue became moot and there was no purpose for the hearing. Nevertheless, the respondent did conduct a hearing, during the course of which he berated DSS, the agency which Swinton represented. Thus, particularly in view of the respondent's condemnation of DSS, the respondent's conduct with respect to Swinton was at least a violation of Canon 3A(4), which requires a judge to "accord to every person who is legally interested in a proceeding, or a party's lawyer, full right to be heard according to law . . . ."

The amended complaint also alleges misconduct by the respondent in a case involving a mother who was having behavioral problems with her daughter. Apparently, in that case the respondent found that it would be in the best interests of the daughter for her to be placed in the custody of her father, who lived in South Carolina. The mother testified that the respondent "seemed to be picking on me" and that "he had a very arrogant look on his face." According to the mother, when she asked how she was going to have a relationship with her daughter if the youth were sent to South Carolina, the respondent said, "You may never have a relationship with her."

Another case which was heard by the respondent involved a 16-year-old boy who had been cited for a curfew violation. On March 13, 1989, the juvenile appeared before the respondent for his arraignment on the curfew violation; at the hearing the juvenile was accompanied by his attorney, his parents, and two uncles. However, the respondent refused to allow the juvenile's two uncles to remain in the courtroom and required all persons not a party to the proceeding to leave the courtroom. After the juvenile had admitted the curfew violation, his attorney requested an immediate disposition and waived a record of the dispositional hearing. There is no indication that the juvenile's mother and custodial parent waived a record.

Then, before proceeding with the dispositional hearing, the respondent ordered everyone except the juvenile to leave the courtroom, but apparently, his attorney was allowed to remain in the room with the juvenile and the respondent. After being excluded from the courtroom for 15 to 20 minutes, the

juvenile's mother was allowed to return to the courtroom.

According to the juvenile's attorney, the respondent's private conversation with the juvenile consisted primarily of a discussion of the effect of the juvenile's father's alcoholism upon the juvenile and his family. The record further shows that the respondent was well acquainted with the juvenile's father, a deputy Sarpy County attorney who is divorced from the juvenile's mother, and that the respondent and the juvenile's father had attended Alcoholics Anonymous meetings together.

Later, the juvenile's mother spoke with her son and discussed what the respondent had said to him in the courtroom in her absence. The mother testified that when she attempted to obtain a transcript of the court proceeding, court personnel initially said that a transcript would be made available to her, but she was later informed by court personnel that "[t]he Judge said [she] couldn't have it." She knew that the respondent's "private dispositional hearing" with her son would not be available, since that portion of the proceeding had occurred after the respondent had ordered the court reporter and everyone else except the juvenile to leave the courtroom. She further testified that the juvenile himself was denied access to a transcript of the proceeding. After her exclusion from the court proceeding and the refusal of her request for a transcript, the mother hired an attorney; her attorney was refused access to the juvenile's court file.

Later, the respondent conducted a second and final dispositional hearing with respect to the juvenile, at which jurisdiction over the juvenile was terminated. This hearing was attended by the juvenile and his attorney, the mother and her attorney, and an aunt who was initially present for the hearing. Referring to her sister, the aunt, the mother testified: "She came into the courtroom with me and we were all getting ready to be seated, the Judge . . . yelled, 'The lady in the back, get outta here.' Which, she was the only lady in the back, so she left."

The mother then described what transpired next:

> The Judge might have read that little bit they read at the beginning of court proceedings, you know, what it's all about and then he started telling us a quote from Oscar Wilde. My attorney had picked up his pen to begin writing

[the juvenile's] name down and what the whole thing was about, and Mr. [sic] Staley *yelled* at him, "Put the pen down, you're not in the classroom anymore! I don't allow writing in my courtroom."

(Emphasis supplied.) The mother's attorney, Michael Lustgarten, testified that the respondent's tone was stern and abrupt when the judge told him to put his pen down. The mother testified that the respondent's conduct "shocked" her, then continued to describe what transpired during the hearing:

First, he spoke to my husband and said — spoke — called him by name, I can remember that, and said, "I realize you're in this — it's an off-hand situation with you, but" — and then he turned to me and told me, that I was being manipulative. I was using my son. He told me that if my brothers and sisters would stay out of his life, he'd be much better off. I don't know. I just felt it was very inappropriate. I don't know that man, he doesn't know me.

With respect to count 1 of the amended complaint, the master found:

The acts of the judge in reference to Lisa Swinton violated both Canons 3 (A)(3) and (4) of the Code of Judicial Conduct, in that the Judge did not act in a patient, dignified and courteous manner to her as a lawyer and did deny her, her full right to be heard according to law and the Judge did have ex parte or other communications concerning a pending or impending matter that she was interested in.

And in reference to [the juvenile charged with a curfew violation], the Judge violated Canon 3 (A), (4) in that he did not accord to the mother as a legal interested party in the proceeding or her lawyer a full right to be heard according to law and was in violation of [§ 24-722(6)], for conduct prejudicial to the administration of justice and that brings the judicial office into disrepute.

However, the commission determined that the respondent's comment to Swinton (i.e., "You'll excuse me, Counselor, if I just don't believe you") "in the context in which it was made, did not support the allegation that Judge Staley failed to be

patient, dignified, and courteous." And with respect to the case involving the juvenile charged with a curfew violation, the commission determined that

> although apparently the mother and father were excused from the courtroom while Judge Staley conducted the brief interview with the juvenile in the presence of the juvenile's attorney, and even though no record was made of this conversation, nevertheless the court shortly thereafter dismissed the complaint against the juvenile and there does not seem to be a violation of the right of an interested party to be heard, and that charge is dismissed.

## COUNT 2

Count 2 of the amended complaint alleged:

> 2. That Judge William Staley, on a regular basis, conducts dispositional hearings without providing for a verbatim record, by dismissing his court reporter and announcing the disposition informally contrary to the provisions of Neb. Rev. Stat. §43-2,111 (Reissue 1988) as construed in In Re Interest of R.A. 226 Neb. 160 410 N.W.2d 110 1987, and more particularly in the case of In The Interest of J.A.N., Docket 20 Page 173, Docket 17, Page 254, Docket 18 Page 316 and Docket 19, Page 302 of the Separate Juvenile Court of Sarpy County, Nebraska contrary to the provisions of Neb. Rev. Stat. §24-722(2) (Reissue 1985), which is a willful disregard or failure to perform his duties, and Neb. Rev. Stat. §24-722(6) (Reissue 1985), conduct prejudicial to the administration of justice, or that brings the judicial office into disrepute and Canon 3(A)(4) of the Code of Judicial Conduct and further by failing to allow a person legally interested in a proceeding or a party's lawyer full right to be heard according to law. More specifically in case Docket 20 Page 173, he refused to allow the mother to attend in the courtroom while he announced the dispositional order regarding her son on March 13, 1989.

The master found that the respondent regularly "conducts dispositional and 'further' dispositional hearings without providing for a verbatim record by dismissing his court reporter

and announcing his decision informally" and that this practice continued to the date of the hearing regarding the charges against the respondent.

While the record does not show that the respondent has ever refused to permit the making of a verbatim record where one has been specifically requested, it is clear that he regularly conducts proceedings "off the record" without having all of the parties waive a verbatim transcript as required by *In re Interest of A.M.H.*, 233 Neb. 610, 447 N.W.2d 40 (1989). In *In re Interest of A.M.H.*, a case originating in Judge Staley's court, this court stated:

> We have noted at the outset the absence of a record of several court proceedings. The separate juvenile court is a court of record. Neb. Rev. Stat. § 43-2,111 (Reissue 1988). In the absence of a valid waiver by all parties to the proceedings, a verbatim transcript of those proceedings shall be made and preserved. See, also, *In re Interest of R.A.*, 226 Neb. 160, 410 N.W.2d 110 (1987).

233 Neb. at 618-19, 447 N.W.2d at 46.

According to the master, the respondent "normally invites the off the record proceedings by inquiring of the attorneys as to whether they want it on the record." Indeed, the testimony of Deputy Sarpy County Attorney Larry Gendler indicates that Judge Staley apparently deems the State to have waived a record by its nonappearance at many dispositional hearings. The record also indicates that Judge Staley may deem parties appearing pro se to have waived a record, as he apparently does not even inquire as to whether such parties waive a verbatim record. The case involving the juvenile accused of a curfew violation is an example of this. That case is discussed above with respect to count 1. While the juvenile's mother in that case was aware that the respondent had asked the court reporter to leave the room when he spoke with the juvenile, it is clear that she did not waive a record of any portion of the proceeding.

With respect to the matter of waiving the rights of parties, in *In re Interest of D.M.B.*, 240 Neb. 349, 360, 481 N.W.2d 905, 913 (1992), a juvenile case, we stated: "Counsel cannot waive rights which are personal to their clients. Personal rights of a litigant must be waived by the litigant personally."

It is also clear that the mother was a party to the proceeding. See Neb. Rev. Stat. § 43-245(2) (Reissue 1988). By ordering the mother out of the courtroom, the respondent wrongfully denied her her full right to be present and to be heard according to the law, in violation of Canon 3A(4) of the Code of Judicial Conduct. Furthermore, the respondent does not contend that the case involving the mother is an isolated incident, as indicated by his own testimony: "Q. Okay. It's not the first time you've sent parents out of the courtroom when you talked to a child in similar circumstances, is it? [JUDGE STALEY:] I don't have a specific recollection of the case, but I wouldn't deny your comment."

In addition, in the instance discussed previously with respect to count 1, Swinton was denied an opportunity to be heard according to the law when the respondent abruptly adjourned the hearing at which she attempted to respond to his criticism of DSS.

The commission found the following with respect to count 2:

Judge Staley admitted that many of his dispositional hearings and postdispositional hearings are conducted off the record. Although in each instance it was Judge Staley's claim that the parties and attorneys were always asked whether they wished to proceed on or off the record, the problem is that there was no evidence that a record was made of such waiver. The Supreme Court in two decisions involving appeals from Judge Staley's court has commented on his failure to have a record made. These cases are: In re Interest of R.A., 226 Neb. 160, 410 N.W.2d 110 (1988); and In re Interest of A.M.H., 233 Neb. 610, 447 N.W.2d 40 (1989). Although the latter of these two cases was released at or about the time these charges were filed, as recited by the Master in his report the record is replete with evidence that Judge Staley has conducted dispositional and further dispositional hearings without providing for verbatim records by dismissing the court reporter and announcing his decision informally. In addition to the two cases cited, [rule 4b(2) of] the Revised Rules of the Supreme Court of the State of Nebraska, March 1989, Rules Relating to Official Court Reporters

[provides]: "The court reporter shall make a verbatim record of . . . [t]he testimony or other oral proceedings." Additionally, the Commission finds that under the Guidelines for Use by Nebraska Courts in Determining When and Under What Conditions a Hearing Before Such Court May be Closed in Whole or in Part to the Public, as a general rule no one should be excluded from a legal proceeding of any type or nature except under certain circumstances, and in the event the court enters an order of closure, a record shall be made of such hearing held in camera. The Commission finds that the evidence before the Master establishes that such guidelines have not been followed. The Commission further adopts the findings and conclusions of the Master as to Charge 2, as contained in his report, and finds that this charge has been sustained by clear and convincing evidence.

In his petition/brief, the respondent demonstrates his lack of understanding and his disregard of the law by engaging in a lengthy discussion of the definition of a "court of record," noting that such a court is not required to create a verbatim transcript of all proceedings. He also argues that a juvenile dispositional hearing is a "post-trial proceeding," falling under rule 4b(11) of the Rules Relating to Official Court Reporters, rather than "testimony or other oral proceedings," falling under rule 4b(2) of those rules. Rule 4b(2) requires a verbatim record of "testimony or other oral proceedings," while rule 4b(11) requires a verbatim record of "[a]ny post-trial proceedings, *at the request of counsel, any party, or the court.*" (Emphasis supplied.) Although the respondent argues that based upon the Rules Relating to Official Court Reporters, dispositional hearings need not be recorded verbatim absent a request for such recordation, he is completely in error. The dispositional phase of a juvenile proceeding is an integral and extremely important part of the proceeding.

Although the meaning of "post-trial proceedings" is not specifically defined in the Rules Relating to Official Court Reporters, rule 4c states that "[t]he recording of any part of the proceedings herein *required* to be made may not be *waived* without the consent of the judge." (Emphasis supplied.) Thus,

the opinion in *In re Interest of A.M.H.*, when read in conjunction with rule 4c of the Rules Relating to Official Court Reporters, makes it abundantly clear that a dispositional hearing is an "oral proceeding," falling under rule 4b(2), *requiring* a verbatim transcript *unless waived*. This court made it clear in that case that verbatim transcripts of dispositional hearings in a separate juvenile court are *required* in the absence of a valid *waiver* by all parties.

Nevertheless, with reference to this court's statement in *In re Interest of A.M.H.*, 233 Neb. at 618-19, 447 N.W.2d at 46, that "[t]he separate juvenile court is a court of record. . . . In the absence of a valid waiver by all parties to the proceedings, a verbatim transcript of those proceedings shall be made and preserved," Judge Staley asserts:

> If the Nebraska Supreme Court wishes to change the Rules, then it should do so. But it should do so by specific amendment to them and not by casually announcing dicta based upon misapplication of Section 43-2,111. And it certainly should not do so in this kind of proceeding. See Section III, Rule No. 2, Rules of Procedure of the Judicial Qualifications Commission.

Judge Staley also contends that the Guidelines for Use by Nebraska Courts in Determining When and Under What Conditions a Hearing Before Such Court May Be Closed in Whole or in Part to the Public, a part of the rules of the Nebraska Supreme Court, should not apply to juvenile courts, asserting that the National Council of Juvenile Court Judges' Handbook for New Juvenile Court Judges suggests that "[t]he hearing itself should be private." However, when read more completely, the handbook states in part:

> The hearing itself should be private with only interested parties present. The hearings are bifurcated with two phases: The adjudicatory, where evidence is taken to establish the allegations of the petition and thus invoke the court's jurisdiction, if the allegations are true; then, the dispositional phase wherein "sentence" is imposed. . . .
>
> . . . .
>
> At the dispositional hearing emphasis now shifts from the offense to concern for the child, and the atmosphere

can be more relaxed and friendly. . . . As much as possible the court should share the information with the family that will influence his decision. Open communication between the parties, the judge and the probation officer is desirable . . . .

*Verbatim* recording of the hearing should be taken in most cases.

(Emphasis supplied.) Regnal W. Garff, National Council of Juvenile Court Judges, Handbook for New Juvenile Court Judges 14-15 (1973).

## COUNT 3

Count 3 of the amended complaint alleged:

3. That Judge William Staley violated the provisions of Neb. Rev. Stat. §24-722(6) (Reissue 1985) in that he engaged in conduct prejudicial to the administration of justice, and that brings the judicial office into disrepute in that he entered a Findings and Order and Capias on August 28, 1989 in a case appearing at Docket 21 Page 194 and Docket 21 Page 274, which Capias directed that a juvenile "be taken into custody and placed in the custody of Sarpy County for detention by delivery to Laddie Kozeny, Sarpy County Administrator", and that on the 29th of August, 1989 he entered an amended Capias in each case which provided for the delivery of the juveniles to "Laddie Kozeny, Sarpy County Administrator or other county department personnel designated by the Sarpy County Board of Commissioners", when such orders were beyond his legal authority and constituted a violation of Neb. Rev. Stat. §24-722(1) (Reissue 1985), willfull [sic] misconduct in office, and Neb. Rev. Stat. §24-722(6) (Reissue 1985), conduct prejudicial to the administration of justice or that brings the judicial office into disrepute.

The record shows that on Monday, August 28, 1989, the respondent issued two capias orders directing law enforcement officers to take two juveniles into custody and place them in the custody of "Laddie Kozeny, Sarpy County Administrator." No capias order issued by the respondent prior to those issued on August 28, 1989, had ordered the Sarpy County administrator

to take custody of a juvenile who was the subject of a capias order. The county administrator is more in the nature of a business officer, having fiscal and administrative duties but no direct authority for involvement with the detention of persons detained by law enforcement officials or the courts of Sarpy County. Prior capias orders had instead placed juveniles in the custody of designated youth detention facilities in other counties or in the custody of probation officers who then secured placement for a detained juvenile.

The circumstances surrounding the issuance of the capias orders reveal that for several years prior to the issuance of these orders, the respondent had voiced his concern that action needed to be taken to provide a juvenile detention facility in Sarpy County. According to the respondent, he had been kept apprised of a remodeling project at the Sarpy County Jail which was to result in a temporary juvenile detention facility in Sarpy County. Then, on August 24, 1989, the respondent learned that the Sarpy County Board of County Commissioners had decided to cancel the remodeling project, thereby eliminating the creation of a temporary juvenile detention facility. The respondent testified that it was his opinion that the county had a legal responsibility to provide a detention alternative with respect to juveniles who were subject to the court's jurisdiction and that he issued the capias orders on August 28, to get the attention of Sarpy County officials and to make them aware of this responsibility.

After the two capias orders were issued on August 28, 1989, copies of the orders were delivered to Laddie Kozeny. Kozeny brought the orders to the attention of members of the Sarpy County Attorney's office, which then sought to have the orders amended. The respondent amended the orders the following day, August 29, but merely changed the placement of the custody of the juveniles in "Laddie Kozeny, Sarpy County Administrator, *or other county department designated by the Sarpy County Board of Commissioners*." (Emphasis supplied.)

Then members of the Sarpy County Attorney's office again sought amendment of the capias orders, while Deputy Sarpy County Attorney Gendler prepared a petition for a writ of mandamus to be filed in this court with respect to the capias

orders. On August 31, 1989, after a meeting with members of the Sarpy County Attorney's office, the respondent finally vacated the amended capias orders, and instead issued capiases directing the subject juveniles to be placed in the "temporary custody of the Sarpy County Sheriff for continued detention in a secure juvenile facility, or as approved by the Juvenile Probation Office." Despite the issuance and amendment of the capias order, the subject juveniles were never taken into custody.

While the respondent testified that the capias orders were issued to get the attention of the Sarpy County Board of County Commissioners, the record shows that some county officials believed that Judge Staley's capias orders were issued vindictively as a result of a dispute between the judge and Kozeny concerning parking spaces at the courthouse.

Kozeny testified that as part of his duties as Sarpy County administrator, he had reassigned parking spaces during the week of August 21, 1989. According to Kozeny, the respondent confronted him on Friday, August 25, regarding the reassignment of parking spaces, and Kozeny noted that the respondent "might have been a little irritated that we didn't notify him that we were going to make the change." Kozeny testified that when he informed the respondent that the parking space reassignment was "going to stand," the judge "said something about, 'Well, we'll see about that.' And then he left." The record indicates that apparently the parking dispute was resolved early the following Monday, August 28, before the respondent issued the capias orders, but upon receiving copies of the capiases later that same day, Kozeny thought they might be somehow connected to the dispute concerning parking spaces.

It is apparent that this dispute over parking spaces may have been on the minds of then Chief Deputy Sarpy County Attorney Michael Wellman and Deputy Sarpy County Attorney Gendler when they attempted to arrange the meeting with the respondent after which the amended capiases were vacated. Wellman and Gendler each testified that they did not wish to meet with the respondent in his chambers because they were afraid that the judge would find them in contempt of

court. The meeting which was arranged took place in the county attorney's office and included the respondent, Wellman, Gendler, and former Sarpy County Attorney John Patrick Kelly. Wellman's testimony describes the meeting:

Q. One of the things you said earlier was that Mr. Kozeny indicated to you, that the Judge had made some comment with regard to parking spaces.

[WELLMAN:] Yes.

Q. Did that issue ever come up during the meeting you've just described?

A. It did.

Q. How did it come up?

A. At one point, Mr. Kelly said to Judge Staley, "You know damn well the only reason you issued those Orders was because of those parking stalls out back anyway."

Q. What happened?

A. I looked at Judge Staley, Larry Gendler, who is seated here, looked at Judge Staley, the room went dead silent for about 30 seconds and then Judge Staley changed the topic of discussion.

Q. Would you describe that meeting as a genial meeting, a friendly meeting?

A. Oh, no. Very tense.

The commission adopted the findings and conclusions of the master with respect to count 3 of the amended complaint. The report of the master states:

The factual basis alleged in this paragraph is relatively uncontroverted. The Judge conceded he worded the Capiases in such a manner as to get the attention of the Board of Supervisors and felt satisfied that he succeeded in making his point as to a juvenile detention facility. The juvenile detention facility was an ongoing problem between the Judge and the Board of Supervisors for some years. The dispute regarding parking stalls was well known in the courthouse, although having been resolved a very short time before the Capiases had been issued. The issuance of the Capiases in the form that the Judge utilized certainly gave the appearance to any courthouse observer that they were issued for a vindictive purpose. Even

though their questionable validity was drawn to the attention of the Judge, his retraction and issuances of the second Capias reemphasized that attitude. The fact that the County Attorney, Chief County Attorney and Deputy County Attorney assigned to Judge Staley's court, were apprehensive about being held in contempt of court if they confronted Judge Staley in his chambers, is disheartening. It convincingly appears that Judge Staley willfully and intentionally misused a court process for other than its proper purpose.

. . . The Judge had no legal or justifiable right to require the Board of Commissioners to fulfill their statutory duties in any particular way. The circumstances surrounding the issuance of the Capiases amply demonstrates [sic] that it was done in bad faith and is willful misconduct. His conduct was prejudicial to the administration of justice and did in fact bring that office into disrepute.

## COUNT 4

Count 4 of the amended complaint alleged:

4. That Judge William Staley violated the provisions of Neb. Rev. Stat. §24-722(6) (Reissue 1985) by engaging in conduct prejudicial to the administration of justice and that brings the judicial office into disrepute in that he habitutally [sic] conducts in camera proceedings at which he excludes attorneys for the Nebraska Department of Social Services. When such in camera proceedings are the meeting at which the disposition of the case is actually decided whereby dispositional orders effecting [sic] wards of the Nebraska Department of Social Services are determined while the legal representatives of the Department are excluded from such hearings contrary to the provisions of Neb. Rev. Stat. §24-722(6) (Reissue 1985).

Count 4, like count 1, involves DSS attorney Swinton, who claims to have been excluded from in camera proceedings.

One instance in which Swinton claims to have been excluded from in camera proceedings pertains to a case involving a

15-year-old boy who was residing with his 36-year-old wife in Iowa after having married her in North Dakota. In that case, Deputy Sarpy County Attorney Gendler was concerned over the juvenile's welfare and the legality of his marriage after his parents had reported him as a runaway. Eventually the boy was returned to Nebraska, and the respondent placed him in the custody of DSS. DSS then placed him in Saint Joseph Hospital because, according to Gendler, "[t]here were some concerns also that he had been brainwashed, that maybe there was alcohol or drugs going on and for that reason, we wanted him in a secure environment to be evaluated." The attorney for the juvenile's wife, Vincent Sutera, then filed a petition for a writ of habeas corpus, seeking his release.

Swinton later informed Gendler that, contrary to his wishes, DSS intended to "terminate [the boy] from their case load." When asked his reaction to this, Gendler testified:

> I was upset. . . . I went and told the Judge what my concerns were, that it appeared without D.S.S., we really had no appropriate vehicle, if you will, to assist this family and this child because Iowa would not get involved. And I told him, in all likelihood, I'd be dismissing the case, because I didn't see a very good chance of changing D.S.S.'s mind. . . .

The record shows that Gendler's conversation with the respondent took place when the parties interested in the case met in Sarpy County. Swinton's testimony describes the circumstances:

> Q. What is your recollection of the parties that were involved in that case?
>
> A. To my recollection, Larry Gendler was the county attorney, Vincent Sutera was the attorney for the child's spouse. There was another attorney that was appointed to act as his personal attorney, the child's, whose name I cannot recall. And there was still one other attorney who represented the child's parents.
>
> Q. And you attended Sarpy County in connection with a hearing on this particular aspect, with the intention to discharge the child?
>
> A. Yes, I did.

Q. Approximately when did that occur?

A. On February 25, 1988.

Q. In the Separate Juvenile Court of Sarpy County?

A. Yes, it did.

Q. What did you do in connection with that matter?

A. I appeared with the case worker at that — in the courthouse. I was able to have one discussion with all the other attorneys regarding our position. And at that time also, the case worker's supervisor was with us. And the county attorney still made it clear that that was not his wish to proceed with discharge. Then there was a subsequent proceeding - - -

Q. Okay. And each of the other attorneys had some position ranging from the Department's to the county attorney's?

A. Yes.

Q. All right. And then what happened?

A. Then there was a movement of all the parties towards the courtroom to see if they were ready for hearing.

Q. Okay. So this discussion occurred outside the courtroom?

A. Yes, it did. No one was in the hearing room. One of the attorneys went to the Judge's office and all the attorneys followed into that room and I was the last one in — into the enter room and at that point I was advised that the Judge did not want me to come in.

Q. By whom?

A. One of the other attorneys there.

Q. Do you remember which one it was?

A. I believe it was Larry Gendler.

Q. Then what'd you do?

A. I waited outside in the hall.

Q. What happened after that?

A. A few minutes later, Vincent Sutera come [sic] out saying he too had now been excluded, so we both waited in the hallway.

Q. Did you and Sutera have a conversation about your exclusion?

A. Yes, we did.

Q. What happened after that?

A. Then all the parties emerged from the Judge's office.

Q. To the hallway?

A. To the hallway.

Q. What happened then?

A. As I recall, no one went toward the courtroom, the child, his attorney, his spouse and her attorney all went to another corner of the building by the door. And I believe I learned from them that there was not going to be a hearing. That, in all likelihood, the child would be discharged. . . .

Gendler testified that while he did recall the meeting of the parties described above, he did not recall that Swinton had been excluded from any proceeding.

Swinton also testified that she was excluded from court proceedings in a case involving another juvenile who had been placed in the custody of DSS. According to Swinton, on one occasion in September 1987, interested parties, including the juvenile's guardian ad litem, Patricia Lamberty, met with the respondent in his courtroom to resolve a dispute concerning the child's continued placement. Swinton testified as follows regarding this proceeding:

Q. Okay. And, I take it from what you've said, that you fully participated in that particular proceeding?

A. I participated on what went on in the courtroom - - -

Q. Did anything else go on?

A. There was an in chambers discussion with Ms. Lamberty and Judge Staley that I did not participate in.

Q. Was anybody else in that in chambers discussion?

A. I do not believe so. I did not see anyone exit from the office other than those two.

Q. Did you attempt to go into that matter — that meeting?

A. That, I do not recall.

Q. Did you have any discussion with anybody about whether you could go into that meeting?

A. Only — by discussion with the case worker. Actually I believe I asked her, "Where did they go?" Because at that

time, only the staff — the D.S.S. staff were present in my view.

Q. So the people had left the courtroom then?

A. Yes.

Q. And this was after you'd initially been in the courtroom?

A. Uh-huh.

Q. How did you determine that the judge and Patricia Lamberty were in his chambers?

A. I saw the Judge exit to his chambers and Ms. Lamberty go through the door.

Swinton also described an October 22, 1987, hearing involving parties interested in the same matter:

Q. Who all was present?

A. Myself, Meg Morris-Berry, who is another worker with the Department of Social Services, Pat Lamberty, the child's mother and the child.

Q. And where did this proceeding take place?

A. In the Sarpy County Juvenile Court.

Q. Was anyone present other than the parties you have described?—The child?

A. Well, the child was present. I believe the case worker was present for a portion of the time, that would have been Paulette Sombke.

Q. What about the Judge?

A. The Judge was in the courtroom, but it was at a time when I was not allowed in.

Q. You say you were not allowed, what happened that caused you not to be allowed?

A. The matter came up for hearing, the child's mother and the child and the Guardian ad Litem went into the courtroom and as I proceeded behind her, could see the Judge — Staley from the bench and he told me that he did not want me in there.

Q. And what did you do?

A. I exited the door.

Q. Did you stay in the vicinity of the courtroom?

A. Yes. I stayed in the waiting area with the other Department staff.

Q. Did something or anything subsequently happen involving you, in connection with that case on that day?

A. A few minutes later, the child and mother exited. The Guardian ad Litem motioned for the rest of us to come in and I and Meg Morris-Berry then went into the courtroom. Judge Staley was there, but not sitting at the bench, sitting at the — where the court reporter usually sits.

Q. What happened then?

A. There was some discussion about what was appropriate for [the juvenile].

. . . .

Q. Did anything else happen in connection with that proceeding on that day?

A. Not that I participated in.

Q. Did you subsequently receive copies of an Order that was entered on that particular day?

A. Yes, I did.

Q. Did you do anything about the Order that you received?

A. Yes. The Order that I received indicated that there had been a hearing and all the person [sic] that I named had been present. Since that was incorrect, I forwarded that to the Attorney General's Office to Royce Harper and asked him, could he file a motion to have the Order amended.

Q. Did he do so?

A. Yes, he did.

In her testimony, Swinton also described two other occasions in which she was or may have been excluded from proceedings concerning the juvenile. On February 9, 1989, Swinton appeared for a proceeding at the request of the DSS caseworker who had asked Swinton to be there with her because she believed that her case plan would be in dispute. According to Swinton: "We both went to the courthouse and waited. We did see that Ms. Lamberty was there and would come in and out of the Judge's office, but then nothing else happened." When asked whether she inquired as to what was going on in the judge's chambers, Swinton testified: "I did not inquire of Ms.

Lamberty what was going on. I did though go into the office and let them know I was there. . . . Later, someone who's — I believe it was Ms. Lamberty, then said that we could go, there wasn't going to be anything further."

On March 15, 1988, Swinton appeared for another hearing regarding the juvenile's placement; according to Swinton, DSS and the guardian ad litem, Lamberty, had differing positions regarding the juvenile's placement. Swinton's testimony described what transpired on March 15:

Q. Was there a proceeding on that — Well, let's back up. Was [sic] there any events occurring in the Judge's chambers on that day?

A. Yes, there was [sic]. At some time while we were all waiting in the waiting area, Ms. Lamberty came out to say that the Judge wanted - - -

Q. Wait a minute. By saying, we were all waiting in the waiting area, who are we?

A. The attorney — Each of the attorneys representing the Department, the foster parent and the school district and the members of their staff that they had brought with them. Ms. Lamberty came out to indicate that the Judge wanted all the attorneys to come into chambers. As I followed I believe, Mr. Breuman, who's the attorney that we hired for the foster parent, Ms. Lamberty stopped me and said, the Judge didn't want you in there.

Q. Okay. And what'd you do?

A. I waited outside in the hall.

Q. Was there any proceeding in the courtroom that day involving that particular case?

A. There was approximately like a three-minute hearing to bring everyone in, as each of the staff had been subpoenaed and the purpose of their proceeding was to advise that all subpoenaed parties had cooperated with their subpoenas and were now free from their obligation.

Q. Was that the end of the hearing?

A. That was the end.

Contrary to Swinton's testimony, when Lamberty was asked if she could recall any in camera conferences with the respondent to the exclusion of Swinton, Lamberty responded:

"Not to my knowledge." Lamberty also testified that she did not recall telling Swinton, "[T]he Judge didn't want you in there," and further testified that she would recall the statement if she had made it. The respondent testified that he did not recall telling Swinton or any other attorney that he did not want him or her to appear before him.

The master found that the allegations made in count 4 of the amended complaint were supported by the evidence, stating:

> Any ex parte communications with one party where information is communicated, which information could or might effect [sic] the decision of the Court would be improper. In the . . . juvenile proceedings of February 25, 1988, it appears that the Deputy County Attorney and others had such a communication with the Judge to the exclusion of the Department of Social Services attorney. It also appears that [in] the In re: . . . case, a transcript of which appears at Exhibit No. 3, that the Court had received some out of court information that did in fact affect his decision before the hearing. It was also apparent to other observers that the Judge and Lisa Swinton were not on cordial terms and the evidence is persuasive and convincing that at least in one other occasion in the . . . juvenile proceedings, an in chambers (ex parte) meeting took place to her exclusion.

However, the commission dismissed count 4 of the amended complaint, stating:

> The Commission finds that the record supports the claim by one attorney for the Department of Social Services that she was told by someone other than Judge Staley that she was not to come into the Judge's chambers on at least one occasion. However, there is no evidence that Judge Staley ever made such an order, and therefore the Commission finds that this charge is not supported by clear and convincing evidence, and this charge is dismissed.

## COUNT 5

Count 5 of the amended complaint alleged:

5. That Judge William Staley violated the provisions of Neb. Rev. Stat. §24-722(6) (Reissue 1985) by engaging in

conduct prejudicial to the administration of justice and brings the judicial office into disrepute, and the provisions of Canon 3(A)(3) of the Code of Judicial Conduct in that he habitually and regularly told juveniles or other persons in the courtroom one or more of the following:

1. They will be little burned out whores by age 21.

2. Hoped that they would die of AIDS or suicide before they were let out in the community again.

These statements were made by Judge William Staley while conducting "off the record" proceedings involving dispositional matters for juveniles in his court.

The record shows that the respondent made statements similar to those described in the amended complaint, but it also shows they were conditional statements. For example, in at least two instances the judge told juveniles something to the effect that "[i]f you don't change your ways you'll be a little burned out whore by the time you're 21." Such statements were made to "streetwise" juveniles, and according to the DSS caseworkers, in each of the cases the comments appeared to have had a positive effect and prompted improvement in the juvenile's behavior.

With respect to the AIDS/suicide comment, the record indicates that the respondent's comments were to the effect that he thought that if DSS did not take serious action the juvenile would die of AIDS or suicide. While Swinton testified that the respondent stated that he "hoped" a juvenile would die of AIDS or suicide, this testimony was not corroborated by other witnesses.

While the master concluded that some of the respondent's statements "cannot be classified as dignified," neither the master nor the commission found a violation of either § 24-722(6) or Canon 3A(3) with respect to count 5.

## DISCIPLINE

As stated previously, the master found that the charges contained in counts 1, 2, 3, and 4 were supported by clear and convincing evidence and that the respondent's conduct violated § 24-722(1), (2), and (6) and Canon 3A(3) and (4) of the Code of Judicial Conduct. The commission adopted the master's

findings with respect to counts 2 and 3, but dismissed counts 1 and 4. Neither the master nor the commission found sufficient evidence to support the charges contained in count 5.

From our de novo review of the record, we find, as did the master, that counts 1 through 4 are supported by clear and convincing evidence and that the respondent has violated § 24-722(1), (2), and (6) and Canon 3A(3) and (4) of the Code of Judicial Conduct.

We further find that the recommendation of the commission, that the respondent be publicly reprimanded, is inadequate under the facts and circumstances of this case.

This court has, in two relatively recent instances, issued opinions sanctioning members of the judiciary. In *In re Complaint Against Kneifl*, 217 Neb. 472, 351 N.W.2d 693 (1984), we suspended a member of the judiciary for 3 months for threatening reprisals against and cursing certain police officers who were engaged in lawful performance of their duties and for asking a county attorney and his partner to "help or see what could be done" for an acquaintance who had been charged with driving while under the influence of intoxicants. In *In re Complaint Against Kelly*, 225 Neb. 583, 407 N.W.2d 182 (1987), we removed a member of the judiciary who acted to prevent the timely prosecution of his son for a traffic violation.

In *In re Complaint Against Kneifl*, we discussed sanctions which have been administered in other jurisdictions for various violations of the standards for judicial conduct. However, in *In re Complaint Against Kneifl* we also noted that

[i]n the final analysis . . . any effort to design the appropriate discipline in this matter by comparing it with that imposed in any case by any other jurisdiction is of limited value. Although analyzing what other jurisdictions have done is instructive, the responsibility of defining and enforcing proper conduct for Nebraska judges falls upon this tribunal. Neb. Const. art. V, § 30(2), and § 24-723. See, also, Neb. Const. art. V, § 1, vesting in this court general administrative authority over all courts.

217 Neb. at 485, 351 N.W.2d at 700.

In determining the appropriate discipline to be imposed in this case, we have considered the entire record as whole. In

doing so, we first note that not only has Judge Staley been discourteous, in violation of Canon 3A(3) of the Code of Judicial Conduct, he in fact denied parties to proceedings before his court the right to participate in those proceedings. A prime example of this is the case involving the juvenile who had been charged with a curfew violation, where during the court proceeding the respondent ordered the juvenile's mother and other members of the juvenile's family to leave the courtroom so that he could talk privately to the juvenile. Furthermore, the respondent's own testimony indicates that his conduct in that case was not merely an isolated incident.

While the respondent's denial of the right of legally interested parties to be heard according to the law violates Canon 3A(4) of the Code of Judicial Conduct, what is more alarming is that it is representative of a course of conduct which appears to be systematically designed to preclude appellate review of proceedings in his court. As stated previously, the master found that the respondent regularly conducts "off the record" proceedings without having all parties waive a verbatim transcript as required by *In re Interest of A.M.H.*, 233 Neb. 610, 447 N.W.2d 40 (1989). Despite the fact that *In re Interest of A.M.H.* was an appeal from his own court, it is evident that the respondent has failed and refused to adhere to our mandate in that case requiring verbatim transcripts in juvenile courts and continued to improperly conduct proceedings off the record, as demonstrated in *In re Interest of L.P. and R.P.*, 240 Neb. 112, 480 N.W.2d 421 (1992), another appeal from the respondent's court.

An example of the respondent's conspicuous desire to preclude the recordation of proceedings in his court is his strange behavior in ordering a party's attorney to put his pen down and declaring that he did not allow writing in his courtroom. A juvenile court is not a star chamber where proceedings may be conducted in secrecy, in the absence of some of the parties, and free from appellate review.

The record in this case clearly and convincingly shows that the respondent has deliberately conducted proceedings in his court in such a manner as to discourage and prevent parties from appealing his decisions to an appellate court. Such

behavior constitutes willful misconduct in office and also is a willful disregard of his duty, in violation of § 24-722(1) and (2).

We finally note the capias orders issued by the respondent which have been discussed. The record clearly and convincingly shows that these orders were issued in bad faith in an attempt to manipulate county officials through the wrongful use of a judicial order. See *In re Complaint Against Kelly, supra*. While the respondent testified that he issued the capias orders to get the attention of county officials regarding the need for a youth detention facility, the record is persuasive that the capias orders were issued, at least in part, as a retaliatory move in a dispute over the assignment of parking spaces. In either case, the respondent's conduct was an abuse of judicial authority.

We believe that the respondent's conduct, as illustrated by the entire record before us, demonstrates that he is unfit to continue to serve in a judicial capacity as a juvenile court judge. We therefore order that William D. Staley be removed from office forthwith.

JUDGMENT OF REMOVAL.

HASTINGS, C.J., not participating.