IN RE COMPLAINT AGAINST PAUL D. EMPSON, DISTRICT JUDGE OF THE 12TH JUDICIAL DISTRICT OF THE STATE OF NEBRASKA. STATE OF NEBRASKA EX REL. COMMISSION ON JUDICIAL QUALIFICATIONS, RELATOR, V. PAUL D. EMPSON, RESPONDENT.
562 N.W.2d 817

Filed May 9, 1997.   No. S-35-960001.

Thomas F. Hoarty, Jr., of McGowan & Hoarty, for relator.

Terrance O. Waite and Keith A. Harvat, of Murphy, Pederson, Waite, Williams & McWha, for respondent.

CAPORALE, WRIGHT, CONNOLLY, GERRARD, STEPHAN, and McCORMACK, JJ.

PER CURIAM.

This original proceeding comes before us upon a complaint filed by the Nebraska Commission on Judicial Qualifications on February 14, 1996, charging respondent, Paul D. Empson, a district court judge of the 12th Judicial District, with five counts of misconduct. The complaint was subsequently amended to add an additional charge.

A hearing on the complaint was conducted on August 12, 13, and 14, 1996. In accordance with Neb. Const. art. V, § 30, and Neb. Rev. Stat. § 24-721 (Reissue 1995), this court appointed the Honorable John T. Grant, a retired member of this court, to serve as special master presiding over the hearing for the purposes of taking evidence and making recommended findings of fact and conclusions of law.

The master found that the charges set forth in counts 1 through 3, 5, and 6 were supported by clear and convincing evi-

dence and that respondent's conduct was therefore in violation of Neb. Rev. Stat. § 24-722(6) (Reissue 1995) and various canons within the Nebraska Code of Judicial Conduct. No findings of fact or conclusions of law were issued regarding count 4 of the complaint in that it involves respondent's conduct in the case *Tapp v. Blackmore Ranch*, 254 Neb. 40, 575 N.W.2d 341 (1998), which was pending before this court when the instant case was filed. As such, the master correctly stayed any proceedings concerning count 4.

The commission adopted the findings and conclusions of the master in their totality and recommended that respondent be suspended from his judicial office for a period of 6 months without pay. Respondent filed a petition in error with this court on December 16, 1996, asking that the commission's recommendation be rejected, modified, or vacated.

## I. STANDARD OF REVIEW

No evidence in addition to that heard by the master has been received by this court. As such, the standard of review in this court is de novo upon the record made before the master. *In re Complaint Against Staley*, 241 Neb. 152, 486 N.W.2d 886 (1992); *In re Complaint Against Kelly*, 225 Neb. 583, 407 N.W.2d 182 (1987).

As set forth in *In re Complaint Against Staley*, 241 Neb. at 155, 486 N.W.2d at 889:

This court must first determine, upon its own independent inquiry, whether the charges against the respondent are supported by clear and convincing evidence; next, we must determine which, if any, canons of the Code of Judicial Conduct and subsections of § 24-722 may have been violated; and finally, we must determine what discipline, if any, is appropriate under the circumstances.

## II. APPLICABLE STATUTORY AND JUDICIAL CODE OF CONDUCT PROVISIONS

The complaint filed against respondent relies on § 24-722, which provides:

A Justice or judge of the Supreme Court or judge of any court of this state may be reprimanded, disciplined, censured, suspended without pay for a definite period of time

not to exceed six months, or removed from office for . . . (6) conduct prejudicial to the administration of justice that brings the judicial office into disrepute . . . .

A clear violation of the Code of Judicial Conduct constitutes, at a minimum, a violation of § 24-722(6). *In re Complaint Against Staley, supra*; *In re Complaint Against Kelly, supra.*

The relevant canons of the Code of Judicial Conduct in question in this matter are the following:

### CANON 1
### A Judge Shall Uphold the Integrity and Independence of the Judiciary

A. An independent and honorable judiciary is indispensable to justice in our society. A judge should participate in establishing, maintaining and enforcing high standards of conduct, and shall personally observe those standards so that the integrity and independence of the judiciary will be preserved. . . .

### CANON 2
### A Judge Shall Avoid Impropriety and the Appearance of Impropriety in all of the Judge's Activities

A. A judge shall respect and comply with the law and shall act at all times in a manner that promotes public confidence in the integrity and impartiality of the judiciary.

B. A judge shall not allow family, social, political or other relationships to influence the judge's judicial conduct or judgment. A judge shall not lend the prestige of judicial office to advance the private interests of the judge or others; nor shall a judge convey or permit others to convey the impression that they are in a special position to influence the judge. . . .

### CANON 3
### A Judge Shall Perform the Duties of Judicial Office Impartially and Diligently

. . . .

### B. ADJUDICATIVE RESPONSIBILITIES.

. . . .

(4) A judge shall be patient, dignified and courteous to litigants, jurors, witnesses, lawyers and others with whom

the judge deals in an official capacity, and shall require similar conduct of lawyers, and of staff, court officials and others subject to the judge's direction and control.

(5) A judge shall perform judicial duties without bias or prejudice. A judge shall not, in the performance of judicial duties, by words or conduct manifest bias or prejudice, including but not limited to bias or prejudice based upon race, sex, religion, national origin, disability, age, sexual orientation or socioeconomic status, and shall not permit staff, court officials and others subject to the judge's direction and control to do so.

The Code of Judicial Conduct demands that judges conform to a higher standard of conduct than is expected of lawyers or other persons in society. *In re Miera*, 426 N.W.2d 850 (Minn. 1988).

## III. DISCUSSION

### 1. COUNT 1

Set forth in its entirety, count 1 of the complaint alleges, "Beginning in or about 1986 and continuing until 1995, Judge Empson engaged in offensive and unwelcome conduct toward various female court personnel, citizens having business in the courts, and student interns, which amounted to sexual harassment."

The master found several episodes in which respondent engaged in offensive and unwelcome conduct. With respect to these findings, respondent asserts that he was placed at a disadvantage in that count 1 of the complaint concerns actions "which amounted to sexual harassment" and that he therefore prepared his case to refute only allegations of sexual harassment and not all conduct he engaged in that "amounted to something less than sexual harassment." Brief for respondent at 10. As such, respondent contends that the special prosecutor was required to prove, by clear and convincing evidence, that respondent was responsible for sexually harassing persons in the workplace, as defined by case law. See *Meritor Savings Bank v. Vinson*, 477 U.S. 57, 106 S. Ct. 2399, 91 L. Ed. 2d 49 (1986) (defining sexual harassment as conduct of sexual nature which has purpose or effect of unreasonably interfering with

individual's work performance or creating intimidating, hostile, or offensive working environment).

Respondent's contention overlooks the obvious: Count 1 expressly states that respondent "engaged in offensive and unwelcome conduct." In light of such wording, it was appropriate for the master to examine respondent's inappropriate conduct despite the possibility that it might not rise to the level of sexual harassment. We note that regardless of whether respondent's actions amount to sexual harassment, the issue before us is the ethical responsibilities of respondent as a judge. See *In re Miera, supra.* We must therefore examine each instance in which respondent is alleged to have engaged in offensive and unwelcome conduct, that may or may not be considered sexual harassment, and determine whether such conduct violated the Code of Judicial Conduct and § 24-722.

### (a) Lori Everts

Everts is a court reporter in Alliance, Nebraska, for Judge Brian Silverman, a district court judge for the 12th Judicial District. Prior to working for Judge Silverman, Everts would occasionally work with respondent when he was in Alliance to handle court matters. Everts worked exclusively for respondent for a short period of time before working for Judge Silverman.

Sometime in 1995, Everts filed a complaint against respondent with the commission. This complaint listed six specific events involving respondent which Everts considered inappropriate.

### (i) Handholding Incident

Respondent and Everts traveled to Gering, Nebraska, on June 2, 1992, for a trial. Due to the length of the trial, they were required to stay overnight in a local motel. After the first day of trial, Everts and respondent ate dinner together at a restaurant in Gering. Before eating, respondent asked Everts if she was going to pray. Everts responded that she would and folded her hands and put her head down. At that point, respondent, without saying anything, placed his hand on the table, and Everts placed her hand on his. Although Everts said nothing to respondent at the time, she stated that holding his hand embarrassed her. Respondent admits the incident occurred but asserts that the

incident was simply a prayer before a meal and that his family usually prays in that manner.

Respondent's regular court reporter at the time was Yvonne (Bonnie) Frye. Frye testified that although she was able to travel with respondent for the trial in Gering, he chose to take Everts. Upon his return, respondent told Frye, " 'Oh, by the way, I got to hold Lori's [Everts'] hand.' " Frye testified that she had prayed with respondent before approximately 30 meals but that she never held his hand.

The master found that the handholding incident occurred and amounted to sexual harassment in violation of Canons 2 and 3B(4) of the Code of Judicial Conduct and § 24-722(6).

### (ii) Stand Up and Turn Around Comment

Sometime in early fall of 1992, the Judicial Resources Commission met in Gering. On that day, Everts wore a sweater and jeans to work in the Alliance courthouse. Respondent noticed this and asked Everts to stand up from her desk, to which she complied. Once Everts was standing, respondent said, " 'Well, turn around.' " According to Everts, she became "embarrassed" and uncomfortable.

Respondent does not remember making these comments but adds that if he had to guess, he was concerned that Everts was not dressed appropriately for work. Aside from this "educated guess" about what happened, respondent did not dispute Everts' account of the incident.

The master found that the incident occurred and that such conduct violated Canons 2 and 3B(4) of the Code of Judicial Conduct and § 24-722(6).

### (iii) Shower Comment

Everts testified that sometime during the summer of 1993, respondent, the clerk of the court, and Everts were in the court-room waiting for a legal proceeding to begin. While on the bench, respondent asked Everts how her shower was that morning, to which Everts responded, " 'Well, why, did it rain this morning.' " Respondent replied, " 'No, how was your shower,' " adding, " 'I bet you wonder why I'm asking you that.' " Everts testified these comments embarrassed and confused her.

Respondent's recollection of the event is that he thought Everts had taken a hurried shower that morning and still had wet hair upon her arrival in the courtroom. According to respondent, the clerk told him " 'That's hair style, that's the style' "; he then said, " 'Oh, sorry,' " and that was the end of the matter.·

The master found that this exchange took place and that respondent's conduct violated Canons 2 and 3B(4) and (5) of the Code of Judicial Conduct and § 24-722(6).

### (iv) Comments Regarding Premarital Sex

Respondent questioned Everts regarding her view of premarital sex on at least two occasions. The first occurred when respondent was in Alliance presiding over legal matters. During a conversation in the clerk's office, respondent informed Everts that the county attorney wanted to have a baby without being married. Respondent asked Everts if she agreed with this, and she responded no. Respondent then asked Everts if she was making her boyfriend wait. Everts testified that respondent was referring to having sex with her boyfriend prior to their marriage. This comment embarrassed Everts. Respondent does not recall the conversation but does not deny that it took place, noting that he had talked to Everts about remaining chaste and pure.

The second incident occurred at the courthouse in Chadron, Nebraska, on March 9, 1994. Everts, working for Judge Silverman at that time, traveled to Chadron to report a legal proceeding. After the case was concluded, Everts, Judge Silverman, and Frye were having a discussion just outside the courtroom. During this discussion, respondent asked Everts if she was making her fiance wait until they were married. Everts interpreted respondent's remark as inquiring whether she was engaging in premarital sex with her boyfriend. Everts testified she did not respond to the question and was humiliated because respondent made the comment in front of others.

Judge Silverman testified that he was present that day and overheard respondent ask Everts if she was keeping herself for her boyfriend until they were married. Judge Silverman interpreted this question as one dealing with premarital sex between Everts and her boyfriend. According to Judge Silverman,

Everts' eyes were filled with tears on the drive back to Alliance and she asked why he did not do anything when respondent made the comment. When asked what his reaction to respondent's comment was, Judge Silverman answered, "I couldn't believe that he said that and I reached down and picked up my briefcase and I said, 'Let's go.' I just — I literally could not believe that in a group of people somebody would ask that question."

Frye was also present during the comment and testified that respondent said something like, " 'I hope you're making him wait until marriage for sex.' " According to Frye, respondent went on to tell Everts that if she did not make her boyfriend wait, he would not cherish or respect her. At a later date, respondent asked Frye if she could imagine Everts "doing it," referring to sexual intercourse.

When asked whether he remembers the conversation and making the comments to Everts, respondent offered the following testimony:

A. Not specifically, but I don't doubt that it happened. I like Ms. Everts' own explanation of what was said better than probably what was said by others.

Q. What do you recall about her explanation?

A. Somewhere in there she said I said remember to keep yourself pure.

Q. You might have said something like that?

A. Probably. At that time I believe I knew that she'd made wedding plans.

Q. Knowing now what you know then about her resentment of that type of conversation, would you make that comment to her?

A. Not at all, not under any circumstances.

The master found, by clear and convincing evidence, that respondent inquired about Everts' sexual activity with her boyfriend on both occasions in violation of Canons 2 and 3(B)(4) and (5) of the Code of Judicial Conduct and § 24-722(6).

### (v) Note to Everts

The remaining complaint made by Everts concerns a note respondent wrote to her on May 7, 1993, concerning some

grammatical errors in her reporting services. After specifically noting five examples of incorrect grammar and spelling mistakes in a particular transcript, respondent concluded the note with, "I love you — enough to risk your displeasure — in the right way," followed by his initials.

Everts testified she became embarrassed when reading the note and did not want anyone to see her reading it. According to respondent, he added the "love you" phrase in order to "soften the blow" of his critique of her work. Furthermore, respondent contends that he did not intend to convey a sexual innuendo with the note and that he was referring to "Christian love" and not a romantic or sexual type of love.

In his report, the master wrote, "I find that the note was written by Respondent, and that the word love, for the purposes of this Report, means 'love' as that word appeared to, and meant to, the recipient of the note." The master went on to conclude that respondent's conduct in writing the note violated Canons 2, 3B(4) and (5) of the Code of Judicial Conduct and § 24-722(6).

### (b) Bonnie Frye

Frye was respondent's court reporter from April or May 1991 until July 1995. Sometime during her first year of employment, Frye attempted to introduce her 70-year-old friend to respondent. Respondent refused, stating that he did not have time. At a later time when Frye asked respondent about his conduct, respondent told her that in his experience, friends could be many things and then asked her if she was "screwing" him. Frye testified that this statement made her furious. Respondent denies asking Frye if she was "screwing" her friend, because he does not use that type of language. Upon further questioning about the incident, respondent stated:

> Now, I met the old fella, I don't know his name, it could have been [Frye's friend], I remember him being from Alliance, I don't believe that I snubbed the man or treated him bad in any way. I didn't spend a lot of time standing around talking with him because I had things to do, but there was no follow-up conversation to that. He was not the kind of man who you would accuse anyone of having sex with, except his wife if he had one, and I didn't say that and I don't like being accused of it and it's wrong.

Respondent also attempted to discredit Frye's credibility by questioning the circumstances under which she left the employment of respondent. Briefly, evidence was adduced that Frye had filed claims with the county for reporting services before she actually filed the transcripts with the court. Upon being made aware of this, respondent reportedly gave Frye the option of quitting or being terminated. However, at no time did respondent report Frye's alleged activities to the county attorney for criminal prosecution. Nonetheless, respondent contends that Frye's testimony is suspect at best, in that she ultimately lost her employment as a court reporter with respondent.

The master, having witnessed and heard the testimony of Frye, determined her testimony concerning the comment made about Frye's friend was truthful. Finding that such a statement was made, the master concluded that respondent subjected Frye to sexual harassment. However, the master did not specifically state which canon or statute respondent violated in making the comment.

### (c) Dee Heineman

Heineman worked as respondent's court reporter from 1981 to 1991. Heineman testified that sometime during 1986 or 1987, she was in the courthouse in Chadron when she overheard a discussion between respondent and Marge Daniels Doerr, the clerk of the district court at the time. Heineman specifically heard respondent tell Doerr, " 'Every time I think of Dee [Heineman] and Marvin [Heineman's husband] having sex, I think of a fat glob oozing all over the top of Marvin.' " Doerr corroborated Heineman's testimony. Heineman testified that she was shocked and angry and wondered why respondent was thinking of her having sex with her husband. The statement also left Doerr uncomfortable and embarrassed.

When asked whether he made such a statement to Doerr, respondent answered with the following:

No. Well, I have no recollection of saying such a thing, I didn't think that. You saw Dee up here, Dee looks pretty much today as she did all the time she was my court reporter, she's never been a person anybody would describe as a blob, I never, ever thought anything like that about her and her husband. What she said about her

impression of the thing is exactly mine, I didn't think about her and her husband in that kind of context at all, I would not have said so if I did, and I certainly wouldn't have used those terms and there was no call for it that anybody's able to say. So it's something that has no beginning and no end and it's just stuck there and I don't believe I said it.

The master found, by clear and convincing evidence, that respondent made the "fat glob" remark to Doerr in violation of Canons 2 and 3B(4) of the Code of Judicial Conduct and § 24-722(6). In reaching this conclusion, the master noted that "[t]o hold otherwise means that both Ms. Heineman and Ms. Doerr concocted the whole story to the utter embarrassment of both Ms. Heineman and her deceased husband."

### (d) Misty Fowler

Fowler attended Chadron State College from August 1992 to May 1996. In furtherance of her studies, Fowler worked as an intern in the Dawes County courthouse during the summer of 1995. As a part of her internship, Fowler would sit in on trials before respondent. During a recess in a felony trial, Fowler had a discussion with respondent in the clerk's office. In this discussion, respondent told Fowler that she should not go to bed angry. When Fowler responded that she understood what the Old Testament says about anger, respondent said, " 'That's not what I mean. I meant don't ever deny your husband sex when you're angry.' " This comment about sex shocked and offended Fowler, in addition to making her feel embarrassed and humiliated.

Respondent admits that this exchange took place but that he did not intend to harass Fowler. Instead, respondent states he was "probably being too cute." Respondent also contends that he did not believe his comments bothered her, noting that Fowler continued to have discussions with respondent during breaks throughout the remaining 3 days of trial.

The master found respondent made the foregoing comments to Fowler in violation of Canons 1, 2, 2A, and 3B(4) of the Code of Judicial Conduct and § 24-722(6). In so concluding, the master added, "I find it particularly disturbing that a judge during a felony trial, can find time, during the trial, to have

uninvited, insensitive public conversations with a 'cute' girl watching the trial, concerning a deeply personal matter."

### (e) Janice Sanford

Sanford is an abstractor and title agent in Chadron. Sometime during the spring of 1995, she and respondent had a discussion in the office of the clerk of the district court. Upon discovery that Sanford was dating an individual, respondent asked her if she was "being good." Sanford replied that as an abstractor, her job depended on her being good and that she was being careful. According to Sanford, respondent told her,

> "I'm not telling you to be careful, I'm telling you to be chaste. That's a decision that you have to make ahead of time, you have to decide to do that ahead of time because if you wait until the heat of the moment it will — you'll make the wrong decision."

This comment made Sanford uncomfortable and she said so, to which respondent replied that he was not trying to embarrass her, he just wanted her to know that the Lord loves her but hates fornication. David Motsick, clerk of the district court for Dawes County, testified that he was also present during this exchange. According to him, Sanford and others were engaged in a conversation in the clerk's office when respondent entered and told Sanford, " 'I hope you're being chaste.' " Kim Frazel, former clerk of the district court in Chadron, was also present and testified that she heard respondent ask Sanford if she was being good, meaning, was she having premarital sex. Approximately 2 weeks later, respondent encountered Sanford in the courthouse in Rushville, Nebraska, and asked her, " 'Are you still being good?' " Not denying he made the comments, respondent testified that he regrets it terribly if he hurt Sanford's feelings.

The master found that respondent made the foregoing comments to Sanford in violation of Canons 1, 2, 2A, and 3B(4) of the Code of Judicial Conduct and § 24-722(6).

### (f) Cindy Brandt

Brandt is a free-lance court reporter and has worked and traveled with respondent. While at the courthouse in Rushville, respondent discovered that Brandt was living with a man she intended to marry. According to Brandt, respondent said, " 'Oh,

that's too bad,'" and "'Well, that's too bad because that makes you a used woman and a tramp and nobody will ever want to marry you.'" This comment embarrassed Brandt, who testified that she does not think a judge should say such things to an employee.

Respondent testified that he believes his discussion with Brandt occurred in a car and admits that an exchange about her living arrangement did take place. According to respondent, upon discovering that Brandt was living with a man, he said, "'I'm sorry to hear that,'" and proceeded to tell her that statistics show that premarital cohabitation reduces the chances for a long-lasting marriage. Although he regrets hurting Brandt, respondent denies that he called her a tramp or a used woman.

The master found that this incident occurred as told by Brandt and was in violation of Canons 2 and 3B(4) of the Code of Judicial Conduct and § 24-722. However, rather than treat this incident as falling under count 1 of the complaint, the master considered it as falling under count 2 of the complaint. Our review of the record and pleadings in this matter leads us to conclude that this event should be treated as falling under count 1 of the complaint.

### (g) Rhonda Flower

Flower, an attorney in Scottsbluff, Nebraska, called respondent sometime between 1991 and 1993 to inform him of a settlement agreement between parties in a civil matter docketed in his court. Flower recalled that the first thing respondent said to her on the telephone was, "'Rhonda, just tell me one thing, at the end of this conversation, will I love you any more than I already do.'" Although Flower was initially embarrassed and uncomfortable with this comment, she eventually considered the statement to be a joke. Respondent remembers making a comment similar to the one Flower recalls but asserts he assumed that the telephone call was concerning bad news or that she was going to ask for a continuance.

The master concluded that the incident occurred as reported by Flower and that respondent's comments violated Canons 1, 2, 2A, and 3(B)(4) of the Code of Judicial Conduct and § 24-722(6).

## (h) De Novo Review of Count 1

From our de novo review of the record concerning count 1, we find that the handholding incident involving respondent and Everts does not rise to the level of an ethical violation. On cross-examination, Everts specifically testified that respondent first put his hand on the table and that she then placed hers on top. This testimony clearly establishes that the handholding occurred as a result of Everts' own volition. We also find that the shower comment does not entail a violation of a judicial canon insofar as respondent was merely commenting on what appeared to be Everts' wet hair. Respondent's intentions in making the comment were corroborated by the testimony of the court reporter that the appearance of wet hair is the new "style." Once respondent was made aware of this, the discussion ended. In a similar fashion, we conclude that respondent violated no canon in asking Everts to stand up and turn around. The testimony concerning the circumstances surrounding this statement established that Everts was dressed rather casually when respondent made the comment. That being the case, we find respondent's testimony that he made the statement because he was concerned that Everts was dressed inappropriately to be credible. Finally, the note written to Everts does not constitute an ethical violation because the purpose of the letter was obvious: to inform Everts of grammatical problems with her reporting. We believe that the fact that the letter was signed with the phrase "I love you" conforms to respondent's desire to "soften the blow" of criticizing Everts' work and was not offensive conduct.

Regarding Frye's contention that respondent asked her if she was "screwing" her friend, we find that this allegation involves a "he said/she said" scenario, especially in light of respondent's vehemently denying he made such a statement. Considering the fact that Frye was possibly a disgruntled employee, we cannot conclude, by clear and convincing evidence, that respondent made the statement.

Concerning the telephone discussion between respondent and Flower, we find that respondent made the "will I love you more than I already do" statement but that it is innocuous and does not amount to an ethical violation. In making this deter-

mination, we once again examine the statement in the context in which it was made. During her testimony, Flower stated that she eventually took the telephone conversation as a joke. In addition, the testimony of respondent reveals that he made the comment thinking Flower was calling with a request for a continuance. In light of this testimony, we cannot say that respondent's statement amounted to offensive conduct in violation of the canons.

With the exception of these incidents, we find, as did the special master, that the remaining incidents discussed above occurred in violation of various canons of the Code of Judicial Conduct. As such, we conclude that count 1 of the complaint is supported by clear and convincing evidence. Indeed, as the preceding discussion details, respondent has clearly engaged in offensive and unwelcome conduct toward women in violation of Canons 2, 2A, and 3B(4) and (5) of the Code of Judicial Conduct and § 24-722(6) on no fewer than eight occasions. We fail to see any purpose whatsoever in respondent's repeated sexual inquiries into the private and personal lives of the persons around him. Such conduct cannot be condoned whatever respondent's motives.

### 2. COUNT 2

The second count of the complaint alleges the following:

Judge Empson has informed a court reporter who previously was employed by him that, in performing his judicial duties, he considers women who are living with men outside of marriage to be more responsible for such conduct than the men because, in his view, it is women who lead men astray.

The court reporter in question, in regard to count 2, is Frye. Concerning this allegation, Frye testified as follows:

Q. What was it that you asked Judge Empson?

A. I just asked him why he was so much tougher on women than he was on men.

Q. In what respect?

A. Well, he had asked [the wife in a divorce case] so many questions about affairs and how many times and who and where and he hadn't — it didn't seem to me like he had said much to [the husband].

Q. Was that something that in your opinion you had observed before?

A. In my opinion, yes.

Q. And by that, I mean a difference between the way the Judge questioned women and men?

A. I felt that way.

Q. And so you asked the Judge about that?

A. Yes.

Q. And what did he say?

A. He said that women were basically more responsible for situations like that than the men were.

Q. When you say situations like that, what do you mean?

A. Well, I was talking about like out of marriage affairs and living with people when you weren't married to them, that was sort of what the case was about in that area of the case.

Respondent testified that Frye misunderstood his comment in that he was simply telling her what a Bible verse in the Old Testament states. Moreover, respondent asserted that he does not subscribe to that belief in making judicial decisions. In support of this contention, several witnesses who are regularly present in respondent's courtroom testified that respondent questions male and female litigants the same and only inquires into a litigant's personal affairs if child custody is in issue.

The master made no specific finding as to whether respondent made and adheres to the foregoing statement. From our de novo review of the record, we are unable to conclude, by clear and convincing evidence, that respondent did, in fact, make this statement to Frye with the meaning she attached to it. Frye testified on cross-examination that she and respondent would often discuss religion. As such, respondent's contention that he was simply discussing a Bible passage appears to conform with the past conversations between the two individuals. Moreover, we find it difficult to believe that respondent would adhere to such a statement in his judicial decisionmaking in light of the numerous witnesses who testified that respondent does not treat women litigants differently from men litigants. We therefore conclude that count 2 of the complaint has not been proved by clear and convincing evidence.

### 3. Count 3

The third count in the complaint alleges the following:

At the conclusion of a criminal case in 1995 (State v. Hunt) after a verdict had been reached, Judge Empson, during a post-trial discussion with the jurors, distributed religious materials to the jurors in the courthouse. Judge Empson has also, in the courthouse, given a copy of the Bible to a litigant who had appeared before him in a domestic relations case seeking a protective order.

### (a) State v. Hunt Jury

The Hunt trial took place in Chadron in 1995 and involved a felony criminal charge. After the jury had returned its verdict, the jurors were invited to stay and ask any questions they had regarding the trial. All jurors remained, and a question and answer session began with the jurors seated in the jury box and respondent in front of the box.

Dorothy Hunter was a juror and former client of respondent when he was a practicing attorney. Hunter noted, during the question and answer session, that respondent had changed since the last time they had met. According to respondent, he told the jurors they did not want to talk about his "change," but they said they wanted to know the reason. At that point, respondent went back to his chambers and returned with 3- by 5-inch pamphlets, containing 21 chapters of the New Testament Book of John. Mary Willnerd, another juror, testified that respondent handed the pamphlets to the first person in the jury box, and the pamphlets were passed down the line. Some jurors, including Willnerd, did not take a pamphlet. Once the pamphlets were distributed, respondent proceeded to tell the jury how he had become a Christian. Both Hunter and Willnerd agreed that the jurors were free to leave at any time and that no one was rebuked for failing to take a pamphlet. Hunter testified that she was not offended by respondent's remarks, while Willnerd stated that she was uncomfortable when respondent handed out the pamphlets.

Sometime after this exchange took place, respondent told Motsick about his distributing religious materials to the Hunt jury and that he had a chance to "witness" to two of the jurors.

An attorney and close friend of respondent who belongs to the same church affiliation as respondent testified that the term "witness" means telling others what you think the Bible teaches and why you believe it and entails an invitation to "come and get a better understanding of what the [B]ible does say." Frye also testified that respondent told her that he "had got to minister to the jury."

Respondent agrees the incident took place but argues that he was not attempting to force his religious beliefs on any juror and that he was simply answering a question asked of him.

The master found the incident took place in violation of Canons 1, 2, and 2A of the Code of Judicial Conduct and § 24-722(6), concluding that "a judge in authority in his courtroom should not present specific forms of religious beliefs" and that "[r]espondent's actions were an effort to proselytize Dorothy Hunter and the other jurors."

## (b) Giving Bible to Litigant

The second incident under this charge concerns a woman named Valerie Brenner. Brenner appeared before respondent seeking a protection order. After granting the order, respondent observed Brenner sitting in the hall outside the courtroom looking distraught. Brenner conveyed to respondent that she and her son were having difficulty reading and understanding their Bible. When Brenner stated she could not afford to purchase a different version, respondent loaned his "New International Version" paperback Bible to her. Respondent testified that he has seen neither Brenner nor his Bible since that day.

Respondent admits the incident occurred but argues that it was not improper because it occurred outside of court and that there was no possibility that Brenner would appear before him again because a protective order violation matter goes before the county court. The master, finding the incident occurred as set forth by both Brenner and respondent, concluded otherwise, stating the discussion and loaning of the Bible was improper because should Brenner appear before respondent again, there could exist questions of impartiality. As such, the master concluded the incident was violative of Canons 1, 2, 2A, and 3B(5) of the Code of Judicial Conduct and § 24-722(6).

### (c) De Novo Review of Count 3

We find, by clear and convincing evidence, that the two incidents alleged in count 3 occurred, but we discuss the appropriateness of each separately.

As a general matter, we find it inappropriate for a judge, as an authority figure, to disseminate religious materials in the courthouse with the intent of impressing his or her beliefs on the recipients. Despite the fact that the Hunt trial was over and the jurors had been excused, the question and answer session in which the religious pamphlets were dispersed proceeded with the jurors remaining in the jury box. More troubling are respondent's remarks that he got to "witness" and "minister" to the jurors. The fact that respondent had completed his judicial "duties" at the time of the discussion is immaterial in determining whether his conduct was appropriate. See *In re Complaint Against Kneifl*, 217 Neb. 472, 351 N.W.2d 693 (1984). While respondent is free to practice his religion as he chooses, his attempts to express his personal views on persons within the confines of the courthouse are violative of Canons 1 and 2 of the Code of Judicial Conduct and § 24-722(6).

In contrast is respondent's exchange with Brenner. The circumstances surrounding this incident requires us to view respondent's conduct in a different light. At the time respondent approached Brenner, she was emotionally distraught. Although we cannot discern from the record whether it was respondent or Brenner that initiated the discussion of the Bible, we can conclude that they both voluntarily engaged in the conversation. Unlike the situation involving the Hunt jury, Brenner actually sought out assistance from respondent. In light of these circumstances, we cannot conclude that respondent's offering of spiritual advice to a distraught woman willing to accept it constitutes an ethical violation.

### 4. COUNT 5

Count 5 of the complaint alleges the following: "During the trial of the Bunnell case, outside of the presence of the jurors Judge Empson stated to one of the trial attorneys: '_____, you don't want to piss me off.'"

The case of Bunnell v. Burlington Northern Railroad was tried before respondent in March 1993. Robert Mullin was one

of the attorneys involved in the case. According to Mullin, he and two other attorneys were sitting at a table during a recess when respondent entered and spoke. Mullin cannot remember the precise comment he replied with but remembers respondent stating, " 'You don't want to piss me off, Mullin.' " Respondent does not remember making the comment but noted that it could have happened. Both respondent and Mullin testified that the trial had run longer than anticipated and that no complaint was ever filed concerning the alleged statement. The master found respondent made the foregoing statement to Mullin in violation of Canons 2 and 3B(4) of the Code of Judicial Conduct.

We agree that the evidence clearly and convincingly supports the allegation that respondent made the statement to Mullin. Although the statement was not judicious, it was apparently made in the middle of a trial that had taken a different path than expected, thereby creating tension. We agree with the master's statement that "Nebraska lawyers are a hardy lot" and that respondent's comment did not strike "any degree of terror into Mr. Mullin's heart." As such, we conclude that respondent's statement does not constitute a violation of any judicial canon.

### 5. COUNT 6

Count 6 was added pursuant to an amended complaint allowed, over objection, by the master. This count alleges the following:

> In or about the summer of 1996 Judge Empson contacted witnesses Dee Heineman and Rhonda Flower for the purpose of interfering with and/or influencing their testimony in this proceeding, in violation of Canons 1, 1A, 2, 2A, 2B, 4 and 4A(3) of the Code of Judicial Conduct, and Neb. Rev. Stat. §§ 24-722(6) and 28-919.

### (a) Contact with Dee Heineman

On July 15, 1996, Heineman was Judge Hippe's court reporter in Gering. Respondent went to Heineman's office that day with a copy of supplemental interrogatory answers in the disciplinary proceeding in which it was stated that both Heineman and Doerr were going to testify about the "fat glob" remark. Heineman testified that respondent came within a foot of her and began yelling and saying he did not want her to get

hurt. Respondent denied that he had made the statement. Marilyn Lynch, Judge Robert O. Hippe's bailiff, testified that she heard respondent yelling from a distance of approximately 60 feet although she could not make out the words. Heineman stated she felt threatened. Respondent acknowledges that he went to Heineman's office that day but contends he went to tell her, in person, that he did not make the "fat glob" statement nor did he threaten her in any way.

The master, noting his previous finding that the "fat glob" statement was, in fact, made, found that respondent's conduct in contacting Heineman was in violation of Canons 1, 1A, 2, and 2A of the Code of Judicial Conduct and § 24-722(6) and Neb. Rev. Stat. § 28-919 (Reissue 1995).

### (b) Contact with Rhonda Flower

The second witness respondent contacted was Flower. During a recess in a court proceeding in July 1996, respondent invited Flower into his chambers and told her that he had no intention of treating her differently in light of her testifying against him. Respondent then gave Flower several compliments on her legal abilities. Flower did not feel that respondent was trying to threaten or coerce her to change her testimony but that she did get the impression that respondent was trying to ingratiate himself with her. In addition, Flower stated that respondent had never given her compliments before. Respondent agrees with Flower's recollection of their meeting in the above manner but asserts he made the comments to Flower to put her at ease considering she was going to testify against him.

The master found that respondent's contact with Flower was in violation of Canons 1, 1A, 2, and 2A of the Code of Judicial Conduct, and § 24-722(6) and Neb. Rev. Stat. § 28-919 (Reissue 1995).

### (c) De Novo Review of Count 6

We find, by clear and convincing evidence, that respondent contacted both Heineman and Flower prior to their testifying at the hearing before the master. We disagree with the master, however, that these contacts constituted a violation of § 28-919. The only provisions of this statute that are remotely applicable are subsections (1)(a) and (b), in which an offender must

attempt to induce a witness to testify falsely or to withhold any testimony or evidence. This did not occur here as evidenced by the testimony of both Heineman and Flower that respondent did not attempt to get them to change or alter their testimony in any way.

Nevertheless, we are still troubled by respondent's contacting individuals about a future proceeding of which he is the subject, especially when respondent was aware that those persons were going to testify against him at the proceeding. Adding to our concern is Heineman's testimony that she felt threatened by respondent's contact and Flower's testimony that she thought respondent was trying to ingratiate himself with her. While respondent's actions in contacting these women do not sustain a violation of § 28-919, they do bring into question respondent's judgment and judicial temperament, and create an appearance of impropriety. Thus, we find, by clear and convincing evidence, that respondent's contacting Heineman and Flower occurred in violation of Canons 1, 1A, and 2A of the Code of Judicial Conduct and § 24-722(6).

## IV. DISCIPLINE

Having concluded that respondent has violated canons of the Code of Judicial Conduct and § 24-722(6) on numerous occasions, we must address the appropriate discipline to be imposed. The commission, in adopting the findings of the master, recommended that respondent be suspended from his judicial office for a period of 6 months without pay. While this recommendation is entitled to be given weight, it is incumbent upon this court to independently fashion an appropriate penalty. Neb. Const. art. V, § 30(2); Neb. Rev. Stat. § 24-723 (Reissue 1995); *In re Complaint Against Kneifl*, 217 Neb. 472, 351 N.W.2d 693 (1984).

The goal of disciplining a judge in response to inappropriate conduct is twofold: to preserve the integrity of the judicial system as a whole and to provide reassurance that judicial misconduct will not be tolerated. These principles were first enunciated in *In re Complaint Against Kneifl*, 217 Neb. at 485-86, 351 N.W.2d at 700, wherein we stated:

> The purpose of sanctions in cases of judicial discipline is to preserve the integrity and independence of the judi-

ciary and to restore and reaffirm public confidence in the administration of justice. The discipline we impose must be designed to announce publicly our recognition that there has been misconduct; it must be sufficient to deter respondent from again engaging in such conduct; and it must discourage others from engaging in similar conduct in the future. Thus, we discipline a judge not for purposes of vengeance or retribution, but to instruct the public and all judges, ourselves included, of the importance of the function performed by judges in a free society. We discipline a judge to reassure the public that judicial misconduct is neither permitted nor condoned. We discipline a judge to reassure the citizens of Nebraska that the judiciary of their state is dedicated to the principle that ours is a government of laws and not of men.

With these principles in mind, we make particular note of the fact that respondent's conduct and statements have violated both the Judicial Code of Conduct and § 24-722(6). Of particular concern are respondent's contacts with witnesses scheduled to testify against him and his apparent pattern of engaging in offensive and unwelcome conduct toward women. This conduct, in and of itself, warrants discipline. See *In re McAllister*, 646 So. 2d 173 (Fla. 1994) (making sexual remarks to employee in addition to incidents of ex parte communication and intentional verbal abuse of attorney warrant order of removal); *Matter of Ackel*, 155 Ariz. 34, 745 P.2d 92 (1987) (using profanity or sexual innuendo per se brings judicial office into disrepute).

In addition, respondent's discussion of his religious beliefs with persons inside the courthouse, his contacting witnesses scheduled to testify against him, and his inappropriate comments to attorneys appearing before him were injudicious and reflect a lack of judgment and judicial temperament. Because these incidents bring respondent's judicial office into disrepute, discipline is required.

Respondent candidly admitted that his conduct was inappropriate at certain times but not to the extent that severe discipline is warranted. While some incidents we have discussed are obviously more bothersome than others, we examine the totality of

the evidence in the record before us to determine the proper discipline. As we have previously stated, examination of a judge's conduct "depends not so much on the judge's motives but more on the conduct itself, the results thereof, and the impact such conduct might reasonably have upon knowledgeable observers." *In re Complaint Against Kneifl*, 217 Neb. at 475, 351 N.W.2d at 696, citing *In re Stuhl*, 292 N.C. 379, 233 S.E.2d 562 (1977). We also agree with the sentiments made by the Florida Supreme Court in its removal of a judge from office for a pattern of misconduct:

> "Conduct unbecoming a member of the judiciary may be proved by evidence of specific major incidents which indicate such conduct, or it may also be proved by evidence of an accumulation of small and ostensibly innocuous incidents which, [taken] together, emerge as a pattern of hostile conduct unbecoming a member of the judiciary."

*In re Crowell*, 379 So. 2d 107, 110 (Fla. 1979). Even if we were to assume that any of the incidents in question, if isolated, would not be worthy of discipline, the accumulation of repeated misconduct by respondent warrants discipline.

The proper imposition of discipline in this matter must be sufficient to deter respondent from engaging in such conduct and to deter others from engaging in similar conduct in the future. *In re Complaint Against Kneifl, supra.* In light of respondent's repeated violations of the Code of Judicial Conduct and § 24-722(6), we suspend respondent immediately from his judicial office for a period of 6 months without pay. This suspension and loss in compensation of approximately $44,000 should convey the clear message that conduct such as that engaged in by respondent has no place in the judiciary and will not be tolerated.

JUDGMENT OF SUSPENSION WITHOUT PAY.

WHITE, C.J., not participating.